**MOBIL EXPLORATION AND PRODUC-ING NORTH AMERICA, INC., successor-in-merger to The Superior Oil Company, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 91–1041T.**

United States Court of Federal Claims.

Jan. 19, 1993.

Richard C. Stark, Washington, D.C., for plaintiff. Miriam L. Fisher and Paul L. Wehrle, of counsel.

Robert Stoddart, with whom were Acting Asst. Atty. Gen., James A. Bruton, Mildred L. Seidman, and Thomas D. Sykes, Washington, D.C., for defendant.

## OPINION

BRUGGINK, Judge.

This matter is before the court on cross motions for summary judgment. The issue is the proper construction of former § 4992 of the Internal Revenue Code (I.R.C.), 26 U.S.C. § 4992 (1984).[1] For the reasons that follow, defendant's motion is granted and plaintiff's is denied.

## BACKGROUND

The following facts are undisputed. Plaintiff, Mobil Exploration and Producing North America, Inc. ("MEPNA"), is a corporation principally engaged in the exploration for and the production of petroleum substances. On April 24, 1986, pursuant to a plan of reorganization and merger, Mobil Corporation ("Mobil")[2] merged The Superior Oil Company ("Superior") with and into MEPNA. MEPNA thus became the successor-in-interest to the rights and liabilities of Superior.

During 1984, Superior owned operating interests in oil and gas producing properties. This production was subject to the Windfall Profit Tax, I.R.C. §§ 4986–98 ("WPT").[3] Specifically, Superior produced taxable crude oil within the meaning of I.R.C. § 4991(a) and was liable for the WPT under I.R.C. § 4986, which applied to profits from crude oil removed during each taxable period. The term "taxable period" was defined to mean each calendar quarter beginning April 1, 1980. I.R.C. § 4996(b)(7).

The applicable tax rate under the WPT Act varied somewhat depending on characteristics of the producer and the method of production. Profits on oil produced by an "independent producer" were taxed at either 30 or 50% whereas profits of other producers were taxed at 60 or 70%. I.R.C. § 4987. This more advantageous tax rate for independent producers provided the impetus to the present lawsuit.[4]

Pursuant to prior agreements, Mobil purchased 28,787,037 shares of Superior's outstanding stock on May 17, 1984. Because of these purchases, Mobil's ownership interest in Superior rose to approximately 22.9% of the aggregate outstanding stock. Prior to this May 17 purchase, Mobil owned less than 5% in value of Superior's outstanding stock.

On May 31, 1984, Superior filed with the Internal Revenue Service ("IRS") in Austin, Texas, its WPT return for the first taxable quarter of the calendar year (January 1, 1984—March 31, 1984). On August 31, 1984, Superior filed another WPT return for the second taxable quarter of the calendar year (April 1, 1984—June 30, 1984). On February 4, 1987, Superior filed a claim for refund (IRS Form 843) of $2,443,429.65 in excess WPT payments, plus interest, for the taxable quarters ended March 31, 1984, and June 30, 1984.

---

1. Unless otherwise noted, all references to the I.R.C. are to the code existing as of 1984.

2. Assumably, Mobil is MEPNA's parent corporation.

3. Congress intended to impose the WPT on what were anticipated to be excessive profits on domestically produced crude oil when price controls were lifted. *United States v. Ptasynski,* 462 U.S. 74, 76, 103 S.Ct. 2239, 2240, 76 L.Ed.2d 427 (1983). The WPT was adopted into the IRC in § 101 of the Crude Oil Windfall Profit Tax Act of 1980, Pub.L. No. 96–223, 94 Stat. 229. The WPT became effective for periods after February 29, 1980. Pub.L. No. 96–223, § 101(i)(1), 94 Stat. 229, 254. It was repealed in the Omnibus Trade and Competitiveness Act of 1988, Pub.L. No. 100–418, § 1941(a), 102 Stat. 1107, 1322, effective August 23, 1988.

4. Independent producers also benefited from an exemption for "stripper well" oil. *See* I.R.C. §§ 4991(a), (b)(6), and 4994(g).

More particularly, Superior claimed a $1,576,785.95 overpayment for the taxable quarter ended March 31, 1984, and an $866,643.70 overpayment for the taxable quarter ended June 30, 1984. On March 28, 1989, the IRS disallowed Superior's claim for refund.

As successor-in-interest, MEPNA now brings this action on Superior's claim for refund. MEPNA is entitled to a refund if the oil produced during the quarters at issue should have benefited from the relatively lower independent producer rates.

## DISCUSSION

The central issue is whether Superior was an independent producer for WPT purposes during the entire taxable quarter ended March 31, 1984, and during that portion of the second taxable quarter ended June 30, 1984, in which it was unrelated to Mobil (April 1—May 16, 1984). Resolving the issue requires a close examination of several interlocking code sections and regulations. The point to begin is I.R.C. § 4992, which provides definitions of "independent producer oil" and "independent producer":

(a) **General rule.**—For purposes of this chapter, the term "independent producer oil" means that portion of an independent producer's qualified production for the quarter which does not exceed such person's independent producer amount for such quarter.

(b) **Independent producer defined.**— For purposes of this section—

(1) **In general.**—The term "independent producer" means, with respect to any quarter in any calendar year, any person other than a person to whom subsection (c) of section 613A does not apply for such calendar year by reason of paragraph (2) (relating to certain retailers) or paragraph (4) (relating to certain refiners) of section 613A(d).

(2) **Rules for applying paragraphs (2) and (4) of section 613A(d).**—For purposes of paragraph (1), paragraphs (2) and (4) of section 613A(d) shall be applied by substituting "calendar year" for "taxable year" each place it appears in such paragraphs.

(c) **Independent Producer Amount.**— For purposes of this section—

(1) **In general.** A person's independent producer amount for any quarter is the product of—

(A) 1,000 barrels, multiplied by

(B) the number of days in such quarter (31 in case of the first quarter of 1980).

(2) **Production exceeds amount.** If a person's qualified production for any quarter exceeds such person's independent producer amount for such quarter, the independent producer amount shall be allocated—

(A) between tiers 1 and 2 in proportion to such person's qualified production of oil for such quarter in each such tier, and

(B) within any tier, on the basis of the removal prices for such person's qualified production of oil in such tier removed during such quarter, beginning with the highest of such prices.

Thus, the relevant definitions are not self-contained. Section 4992 makes any entity an independent producer, unless § 613A(c) does not apply to that person by virtue of subsections (2) or (4) of § 613A(d). Section 613A pre-existed the WPT Act, having been adopted as part of the Tax Reduction Act of 1975, Pub.L. No. 94–12, 89 Stat. 26 (1975). Section 613A eliminated the percentage depletion allowance deduction for major oil and gas producers but exempted independent producers. It reads, in relevant part, as follows:

(c) **Exemption for Independent Producers and Royalty Owners**

(1) **In general**

Except as provided in subsection (d), the allowance for depletion under section 611 shall be computed in accordance with section 613 with respect to—

(A) so much of the taxpayer's average daily production of domestic crude oil as does not exceed the taxpayer's depletable oil quantity; and

(B) so much of the taxpayer's average daily production of domestic natural gas as does not exceed the taxpayer's depletable natural gas quantity; and the applicable percentage (determined in accordance with the table contained in paragraph (5)) shall be deemed to be specified in subsection (b) of section 613 for purposes of subsection (a) of that section.

\* \* \* \* \* \*

**(d) Limitations on Application of Subsection (c)**

\* \* \* \* \* \*

**(2) Retailers excluded**

Subsection (c) shall not apply in the case of any taxpayer who directly, or through a related person, sells oil or natural gas (excluding bulk sales of such items to commercial or industrial users), or any product derived from oil or natural gas (excluding bulk sales of aviation fuels to the Department of Defense)—

(A) through any retail outlet operated by the taxpayer or a related person, or

(B) to any person—

(i) obligated under an agreement or contract with the taxpayer or a related person to use a trademark, trade name, or service mark or name owned by such taxpayer or a related person, in marketing or distributing oil or natural gas or any product derived from oil or natural gas, or

(ii) given authority, pursuant to an agreement or contract with the taxpayer or a related person, to occupy any retail outlet owned, leased, or in any way controlled by the taxpayer or a related person.

Notwithstanding the preceding sentence this paragraph shall not apply in any case where the combined gross receipts from the sale of such oil, natural gas, or any product derived therefrom, for the taxable year of all retail outlets taken into account for purposes of this paragraph do not exceed $5,000,000....

**(3) Related person**

For purposes of this subsection, a person is a related person with respect to the taxpayer if a significant ownership interest in either the taxpayer or such person is held by the other, or if a third person has a significant ownership interest in both the taxpayer and such person. For purposes of the preceding sentence, the term "significant ownership interest" means—

(A) with respect to any corporation, 5 percent or more in value of the outstanding stock of such corporation....

. . . .

For purposes of determining significant ownership interest, an interest owned by or for a corporation, partnership, trust, or estate shall be considered as owned directly both by itself and proportionately by its shareholders, partners, or beneficiaries, as the case may be.

**(4) Certain refiners excluded**

If the taxpayer or a related person engages in the refining of crude oil, subsection (c) shall not apply to such taxpayer if on any day during the taxable year the refinery runs of the taxpayer and such person exceed 50,000 barrels.

The shorthand result of these provisions is that oil subject to the lowest WPT rates must not exceed certain quarterly maximums, and it must be produced by an "independent producer." A producer, in turn, is independent so long as it is not, directly or by relation, a retailer or refiner. There is no question that Mobil, for all relevant periods, was both a retailer and refiner. It is also undisputed that before the May 17, 1984, stock acquisition by Mobil, Superior was not a refiner or retailer within the meaning of these exclusions. Thus, when Superior became related to Mobil on May 17, the question arose, did the fact that Superior was thereafter related to a refiner and producer mean that it was not an independent producer with respect to its prior production for 1984?

The parties have markedly different views as to the answer to that question.

MEPNA's preferred result is that the deduction covers all production through May 16. As it states in its response brief, for a producer to lose its status as an independent, "the inapplicability of section 613A(c) must endure for the entire calendar year." Defendant's preferred position is that the Mobil purchase on May 17 deprived Superior of the deduction *nunc pro tunc* to January 1, 1984, regardless of the fact that the two companies were not related during the first quarter of the year.

Defendant focuses on the phrase "calendar year," which appeared in § 4992(b) for the first time after an amendment to the WPT adopted in 1982.[5] Defendant's argument is succinctly stated in its opening brief:

> During the calendar year 1984, Mobil held a significant ownership interest in persons who engaged in the refining of crude oil and who had refinery runs in excess of 50,000 barrels on at least one day of the year. As of May 17, 1984, Mobil also held 22.9% in value of the outstanding stock of Superior. Therefore, in calendar year 1984, a person related to Superior (through Mobil, the common owner) engaged in the refining of crude oil, and on at least one day during the calendar year the refinery runs of Superior and a related person exceeded 50,000 barrels. According to the plain words of Section 613A(d)(4), subsection (c) of Section 613A cannot apply to Superior for the calendar year.
> The statute requires no explanation. . . .

Brief of July 17, 1992, pp. 10–11.

Defendant concedes that prior to the change in 1982, whether a company was an independent producer for WPT purposes depended, like the volume calculation, solely upon events within a single quarter. Absent the change in language, therefore, Superior would have been an independent producer for the first quarter, since at no point during that quarter was it related to a retailer or refiner. According to defendant, Superior lost its independent produc-

er status during the second quarter, however, at least with respect to the WPT, because it was related to a retailer and refiner for a portion of the quarter.

Defendant argues that the present version of § 4992(b) makes it clear that entities such as Superior are no longer entitled to preferred status at any point during a year in which it becomes related to an refiner or producer. Because of the importance of the 1982 amendment, it is reflected below in terms of *highlighted* additions and crossed-through deletions to the prior version:

**(b) Independent Producer Defined**

For purposes of this section—

**(1) In General**

The term "independent producer" means, with respect to any quarter *in any calendar year*, any person other a person to whom subsection (c) of section 613A does not apply *for such calendar year* by reason of paragraph (2) (relating to certain retailers) or paragraph (4) (relating to certain refiners of section 613A(d)).

**(2) Rules for Applying Paragraphs (2) and (4) of Section 613A(d)**

For purposes of paragraph (1), paragraphs (2) and (4) of section 613A(d) shall be applied *by substituting "calendar year" for "taxable year" each place it appears in such paragraphs.—*

~~(a) by substituting "quarter" for "taxable year" each place it appears in such paragraphs, and~~

~~(b) by substituting "$1,250,000" for "$5,000,000" in paragraph (2) of section 613A(d).~~

It is apparent from the language deleted why the earlier version of § 4992 was construed to limit the § 613A inquiry to events that occurred within the WPT taxable period, i.e., the quarter. When read from the perspective of the WPT, both § 4992 and § 613A were keyed to a quarterly period by virtue of old § 4992(b)(2)(A). The fact that a producer might be disqualified for too much refining activity, for example in

---

**5.** The present version of § 4992 took shape in the Technical Corrections Act of 1982, § 201(d), Pub.L. No. 97–448, 96 Stat. 2365, 2392 (1982). The changes became effective in 1983.

the fourth quarter, would not prevent a favorable WPT result for a different quarter. After 1982, however, the determination of independent producer status pursuant to § 4992 incorporated a test which was annual in character. It is thus apparent that the defendant has the better argument that the language as it read in 1984 would bar MEPNA from benefiting from the fact that Superior was unrelated to it prior to May 17, 1984. The least strained reading[6] of § 4992(b)(1) is that the status of a producer for a given quarter of the WPT depended on a producer meeting the requirements of § 613A "for the calendar year." In other words, although the period for fixing the amount of tax for WPT purposes was the quarter, status as an independent producer for that quarter depended on maintaining eligibility for the entire year pursuant to § 613A.[7]

The question thus becomes, would Superior have been entitled to independent producer status under § 613A? The answer, according to MEPNA, is yes. It claims that it should be treated as an independent producer at least through May 16, or, alternatively, for the entire year. The court disagrees on both counts.

MEPNA looks at the 1982 change in the legislation and concludes that the inclusion of the phrase "calendar year" in § 4992 merely reflected Congress' concern with making uniform the application of the limitations in § 613A(d) on attaining independent producer status. Plaintiff contends that any disparity in treatment ended with the 1982 technical amendments to § 4992. "Congress stated unequivocally its intent that 'for calendar year taxpayers the determination of independent producer status will be made on the same basis for windfall profit tax and income tax purposes.'" Plaintiff's brief of August 24, 1992, citing H.Rep. No. 97–794, 97th Cong., 2d Sess., p. 30 (1982).[8]

The risk in plaintiff's contention is apparent. The argument only assists MEPNA in arriving at its goal if it is correct in its critical assumption that under the depletion allowance provisions, Superior would have been an independent producer at least until May 17, 1984.[9] If MEPNA is wrong about

---

**6.** Defendant's faith in Congress' attention to rules of grammar and to its powers of nuanced articulation may be misplaced. Nevertheless, it is not an inappropriate argument. Inevitably, the parties and the court must construe the meaning of the words in question and attempt thereby to arrive at what Congress meant. The legislative body is presumed to mean what it says, and only if literal meaning makes too great a departure from reason should we resort to our own speculations from evidence of concealed intent reflected in secondary materials.

**7.** In its lengthy grammatical analysis, defendant is correct that the phrase, "section 613A does not apply for such calendar year" is of a single piece. The court counts it highly unlikely that Congress really meant the word "for" in the phrase, "for the calendar year" to mean that the exclusions under § 613A had to apply "throughout" or "during," as MEPNA's argument implies. MEPNA's construction ignores the annualized focus of § 613A (e.g., "average daily production" in subsection (c)(1); "combined gross receipts ... for the taxable year" in subsection (c)(2); "engages in [ ] refining ... during the taxable year" in subsection (c)(4)).

**8.** There is support for this view. The most obvious is the statutory linkage between § 4992 and § 613A. Also, in 1980, when the WPT was adopted, the Joint Committee on Taxation explained as follows:

> For windfall profit tax purposes, the term "independent producer" generally means any person who is defined as being eligible for percentage depletion under section 613A. The term, therefore, generally excludes crude oil refiners and retailers of crude oil and natural gas under the same circumstances in which they are denied the deduction for percentage depletion of oil and gas income. STAFF OF THE JOINT COMM. ON TAXATION, 96TH CONG., 2D SESS., GENERAL EXPLANATION OF THE CRUDE OIL WINDFALL PROFIT TAX ACT OF 1980 (Comm.Print 1981).

**9.** MEPNA plainly cannot succeed for the second quarter. Section 4992 certainly makes no accommodation for daily changes in independent producer status. In fact, everything about § 4992 suggests that determinations are made once for the quarter. The disqualification prompted by § 613A(d)(2) or (4) would thus affect that entire taxable period. This is consistent with § 4992(c), which defines the Independent Producer Amount in terms of the number of days in a quarter multiplied by 1,000. The clear implication is that this figure would be the same for any putative independent producer, i.e., between 90 and 92 days, depending on the quarter. As defendant points out, this construction is supported by the House Conference Report: "To be eligible, a producer must not be an oil or gas retailer or an oil refiner in the taxable period." H.R.Conf.Rep. No. 817, 96th Cong., 2d Sess. 109 (1980–3 C.B. 245, 269).

the application of § 613A, then uniformity results in an all-or-nothing annualized disallowance determination under both provisions. As the court explains below, it is persuaded that MEPNA's construction of both § 4992 and § 613A are incorrect.

MEPNA gets halfway to its target through Treas.Reg. § 1.613A–4(b), which deals with the retailers' exclusion to the depletion allowance. This interpretive regulation provides the following example:

> Example 14. L, a calendar year taxpayer, is the owner of a producing oil property. On September 1, 1976, L purchased a chain of gasoline service stations. Therefore, L was a retailer of oil and gas for the last 122 days of 1976. L's gross income from the oil property for the taxable year was $150x and L's taxable income from the property was $30x. L is treated as a retailer with respect to $50x of gross income from the property ($150x $\times$ $^{122}/_{366}$) and $10x of taxable income from the property ($30x $\times$ $^{122}/_{366}$). Therefore, L is entitled to percentage depletion with respect to $100x of gross income from the property ($150x minus $50x).

In other words, if the only basis for exclusion is connection to a retailer, and if a producer is disqualified on that basis only for the last 122 days of the year, then during the first two-thirds of the year it would qualify for the percentage depletion allowance, and hence for the reduced WPT rates. MEPNA concedes that there is no similar example with respect to the parallel refining limitation (§ 613A(d)(4)), but contends for a similar construction. The only stated basis for construing § 613A(d)(4) as MEPNA suggests is its preference for symmetry. There is nothing in the statute itself, however, that prompts the retailing example, much less an extension of it, to embrace the refining limitation.[10] Section 613A(d)(4) merely states that the favorable treatment afforded by § 613A(c) is unavailable "if on any day during the [calendar] year the refinery runs ... exceed 50,000

barrels." On the face of it, this language seems plain enough. If the single day of overproduction were January 1 or December 31, the result would appear to be the same.

MEPNA also relies on Treasury regulations which were adopted to interpret § 4996 for the purpose of demonstrating that the agency construed the WPT as permitting a producer to elect to be treated as an integrated oil company, i.e., not an independent. The intended and correct implication is that the regulations recognized that a producer could be both an independent and an integrated company in the same year. See, e.g., Treas.Reg. §§ 51.4995–2(a), 2(c), 2(d), and 51.4996–1(g)(3). As defendant points out, however, these regulations were adopted prior to 1983, and thus cannot be said to be dispositive of the question at bar, which focuses on the meaning of the change that became effective in that year.

MEPNA also places much reliance on congressional interest, manifested in both sections, in promoting oil and gas exploration and production by independent producers. There is no question that such was one of Congress' purposes. See Commissioner v. Engle, 464 U.S. 206, 218–19, 104 S.Ct. 597, 605, 78 L.Ed.2d 420 (1984). This observation begs the question, however, of whether a given producer has demonstrated that it is independent and thereby entitled to preferential treatment under the Code. The latter is a particularly relevant concern in view of the nature of the question here—whether purchase of an independent producer by a large refiner/retailer causes the loss of benefits under §§ 4992 and 613A.

What is perhaps a more cogent rule of construction is that exemptions and deductions are subject to a rule of strict construction derived from I.R.C. § 61. MEPNA contends that a bias against construing § 4996 favorably toward it is off the mark,

10. The commentaries are in accord. See MATTHEW BENDER, FEDERAL TAXATION OF OIL AND GAS TRANSACTIONS, ¶ 3.05[11] AT 3–135; 1 FEDERAL PROGRAMS ADVISORY SERVICE, CRUDE OIL PRICING/WINDFALL PROFIT TAX INFORMATION SERVICE 112 (1980). The example discussed by the Federal Programs Advisory Service also contains language facially helpful to MEPNA. Plaintiff was correct in not citing it, however, because it obviously speaks to circumstances before the 1982 amendment.

**470**

because that section imposes an excise tax, not an income tax. What MEPNA overlooks, however, is that § 4996 is structured in such a way that it can only be relied upon if the taxpayer satisfies the requirements of § 613A. That section, in turn, is an income tax provision, and MEPNA's motion for summary judgment requires the court to agree with the plaintiff's contested construction of it. The fact that the Supreme Court has specifically held that depletion allowances are a matter of legislative grace is thus relevant. *Parsons v. Smith*, 359 U.S. 215, 219, 79 S.Ct. 656, 659, 3 L.Ed.2d 747 (1959).

One of the court's initial concerns with both parties' constructions of § 4992, expressed at oral argument, was that neither appeared to give full play to the language in § 4992(b)(1), "with respect to any quarter." The language plainly is fatal to MEPNA's argument with respect to the second quarter of 1984, but the court is now satisfied that it does not undercut defendant's argument as to the first quarter. There is full room for the quarterly character of tax calculation to have effect, even if *status* determinations are made on all-or-nothing annual basis. WPT returns were made quarterly, although an annual information had to be filed, and corrections could be made in the quarterly or annual filings if necessary to reconcile insufficient or overpaid taxes. *See* Treas.Reg. §§ 51.-4997–2(c)(1) and 51.4995–1(c)(1)(ii). Both before and after the 1982 amendment, WPT was calculated by applying the rates to volumes of independent producer oil, which were determined on a quarterly basis. *See* I.R.C. §§ 4987(b)(2), 4992(a). Consequently, after the 1982 amendment, the question of independent producer status for WPT purposes was determined on an annual basis, but the quarter was still the relevant period for determining the amount of the tax. The amount of production in excess of the approximate 90,000 barrel maximum was thus determined exclusively within the parameters of the particular quarter, irrespective of production in another quarter. *See* 1 FEDERAL PROGRAMS ADVISORY SERVICE, CRUDE OIL PRICING/WINDFALL PROFIT TAX INFORMATION SERVICE 117

(1980). The compartmentalized approach to the amount of production subject to the higher rates did not arise if the producer did not fit within the preferred status for any part of the year. In sum, the court is persuaded that defendant's construction of the applicable version of § 4992 gives literal and complete effect to its phrasing and is consistent with congressional intent.

### CONCLUSION

Superior was not entitled to claim the lower WPT rates for 1984. Thus, MEPNA's motion for summary judgment is denied, and defendant's motion is granted. The Clerk is directed to dismiss the complaint. No costs.