**J.M. HUBER CORPORATION, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 91–1094T.**

United States Court of Federal Claims.

Feb. 26, 1993.

Michael A. Guariglia, Newark, NJ, for plaintiff.

W.C. Rapp, Washington, DC, with whom was Acting Asst. Atty. Gen., James A. Bruton, for defendant.

## OPINION

NETTESHEIM, Judge.

This case comes before the court after argument on defendant's motion to dismiss, which, for all intents and purposes, is to be treated as a motion for judgment on the pleadings since defendant filed its answer prior to the instant motion. *See* RCFC 12(b), (c). The issues are 1) whether the taxpayer is entitled to the business energy credit for the construction or acquisition of "alternative energy property," pursuant to 26 U.S.C. ("I.R.C.") § 48($l$)(3) (1988), and the pertinent regulation, Treas.Reg. § 1.48–9(c) (1984), 26 C.F.R. 221–25 (1984), *i.e.*, "equipment designed to modify existing equipment which uses oil or natural gas as a fuel or feedstock," I.R.C. § 48($l$)(3)(A)(iv), where the taxpayer replaced diesel trucks with a clay slurry pipeline for use in transporting clay to the processing facility; and 2) if the pipeline that replaced diesel trucking is not thereby excluded from the definition of "alternative energy property," whether the taxpayer's pipeline "will use either a substance other than oil and natural gas, or oil mixed with a substance other than oil and natural gas (where such substance will provide not less than 25 percent of the fuel or feedstock)," 26 U.S.C. § 48($l$)(3)(A)(iv), and therefore qualify for the credit.

## FACTS

Plaintiff's recitation of the facts is accepted. J.M. Huber Corporation ("plaintiff") is a New Jersey corporation involved in the business of mining, manufacturing, and electronic assembling. Since 1939 plaintiff has operated a plant in Huber, Georgia (the "plant"), to process crude clays (commonly referred to as kaolin) that are used primarily in paper, rubber, and other industrial products. During 1978 plaintiff opened mines located in Wilkinson County, Georgia, and began to transport, via diesel trucks, the mined kaolin to the plant in Huber. The truck route was 35 miles each way, or 70 miles round trip.

As demand for the kaolin increased, additional trips to the Wilkinson County mines were necessary, resulting in increased fuel

costs. Plaintiff determined that an annual consumption of approximately 166,320 gallons of diesel fuel would be necessary to continue transport by truck. Plaintiff determined that the construction of a 26–mile slurry pipeline (the "pipeline") from the mines to the plant would reduce the energy required to transport the kaolin to approximately one-sixth of the energy required by continued use of diesel trucks.[1] Plaintiff completed construction of the pipeline in 1984, thereby eliminating the need for diesel-fueled trucks. The total construction cost was $5,933,462.00.

On its federal corporate income tax return for calendar year 1984, plaintiff listed a qualifying investment in the pipeline of $4,452,462.00, treating it as "alternative energy property," as defined in I.R.C. § 48(*l*)(3) and Treas.Reg. § 1.48–9(c). Accordingly, plaintiff claimed a business energy credit in the amount of $445,299.00. On March 28, 1990, the Commissioner of the Internal Revenue Service (the "Commissioner") issued a notice of deficiency asserting an underpayment of income tax as a result of various adjustments, including the disallowance of the business energy investment credit. Plaintiff paid the deficiency in full and timely filed a claim for refund of the tax and interest attributable to the disallowance of the business energy investment credit. The Commissioner failed to act upon the claim within six months. This action followed.

## DISCUSSION

■ Defendant moves pursuant to RCFC 12(b)(4) (identical to Fed.R.Civ.P. 12(b)(6)) to dismiss the complaint for failure to state a claim upon which relief can be granted. However, since defendant answered plaintiff's complaint, a motion under RCFC 12(b)(4) cannot properly lie because "[a] motion making any of these defenses shall be made before pleading...." RCFC 12(b). However, as the Seventh Circuit has pointed out, "[a] motion made after the filing of an answer serves the same function as a motion for judgment and may be regarded as one." *Schy v. Susquehanna Corp.*, 419 F.2d 1112, 1115 (7th Cir.), *cert. denied*, 400 U.S. 826, 91 S.Ct. 51, 27 L.Ed.2d 55 (1970). Accordingly, the court deems the instant motion to constitute a motion for judgment on the pleadings pursuant to RCFC 12(c).

### I. *Standards for motion for judgment on the pleadings*

The standards and background for deciding such a motion are set out in *Johns–Manville Corp. v. United States*, 12 Cl.Ct. 1, 14–16 (1987) (granting and denying motions for judgment on the pleadings); *see also Marrero Land & Improvement Ass'n, Ltd. v. United States*, 26 Cl.Ct. 193, 194–95 (1992). RCFC 12(c) (identical to Fed. R.Civ.P. 12(c)) provides in full:

After the pleadings are closed, but within such time as not to delay the trial, any party may move for judgment on the pleadings. If, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 26, and all parties shall be given reasonable opportunity to present all material made pertinent to such motion by Rule 56.

For purposes of ruling on a motion for judgment on the pleadings, the traditional standard is that a court must assume that all well-pleaded facts in the non-movant's pleading are true, that all controverted assertions of the movant's pleadings are false, *Hospital Bldg. Co. v. Trustees of Rex Hospital*, 425 U.S. 738, 740, 96 S.Ct. 1848, 1850, 48 L.Ed.2d 338 (1976), and the court must ignore any assertions in the pleadings that amount to legal conclusions. *Olpin v. Ideal Nat'l Ins. Co.*, 419 F.2d 1250, 1255 (10th Cir.1969). With the facts

---

1. The pipeline employed the use of gravity and electrically powered pumps to transport the kaolin which was suspended in water. Since the mine was located 39 feet above the level of the plant, gravity helped move the kaolin through the pipeline. The electrically powered pumps applied the additional pressure needed to move the kaolin through the pipeline. The electricity required to run the pumps was supplied by Georgia Power, which produces electricity from energy sources consisting of approximately 90 percent coal.

no longer in controversy, only questions of law remain, and the court's ruling on the motion is based on the substantive merits of the claims and defenses as alleged in the non-movant's pleading. The motion therefore cannot be granted if the non-moving party has alleged facts that, if proved, would prevent the movant from prevailing. *Austad v. United States*, 386 F.2d 147, 149 (9th Cir.1967); *J.M. Blythe Motor Lines Corp. v. Blalock*, 310 F.2d 77, 78–79 (5th Cir.1962). If the issues of fact are unresolved in the pleadings, they cannot be decided in ruling on a Rule 12(c) motion. *Halliday v. United States*, 7 Cl.Ct. 315, 321 (1985). Finally, if an unresolved factual issue is material, the motion cannot be granted. *Duhame v. United States*, 127 Ct.Cl. 679, 684, 119 F.Supp. 192, 195 (1954).

■ The United States Court of Claims adopted a more rigorous standard for granting a motion for judgment on the pleadings:

> A motion for judgment on the pleadings should be denied unless it appears to a certainty that plaintiff is entitled to no relief under any state of facts which could be proved in support of his claim. *Brown v. Bullock*, 194 F.Supp. 207 ([S.D.N.Y.] 1961), *aff'd*, 294 F.2d 415 (2d Cir.1961); *Rosenhan v. United States*, 131 F.2d 932 (10th Cir.1942), *cert. denied*, 318 U.S. 790 [63 S.Ct. 993, 87 L.Ed. 1156] (1943); *Kohen v. H.S. Crocker Co.*, 260 F.2d 790 (5th Cir.1958)....

*Branning v. United States*, 215 Ct.Cl. 949, 950–51 (1977). Although *Brown* and the other cited cases restate the traditional formulation that a motion for judgment on the pleadings admits facts, but not conclusions of law, other courts have adopted its more rigorous standard. *See Bloor v. Carro*,

754 F.2d 57, 61 (2d Cir.1985).[2] This standard was utilized in *National Bank of Ft. Sam Houston v. United States*, 225 Ct.Cl. 698, 700 (1980); *Mastowy v. United States*, 24 Cl.Ct. 193, 197 (1991); and *Schultz v. United States*, 5 Cl.Ct. 412, 415 (1984).

■ A strong public policy in federal courts exists in favor of ensuring a litigant a complete and fair hearing on the merits of a claim. *See, e.g., Greenberg v. FDA*, 803 F.2d 1213, 1216 (D.C.Cir.1986). Since summary disposal of cases is in opposition to this policy, a strict standard is generally applied in ruling on Rule 12(c) motions. *Roemhild v. Jones*, 239 F.2d 492, 494 (8th Cir.1957). In ruling on defendant's motion, the court has excluded from consideration any matters outside the pleadings, except insofar as plaintiff briefed or argued factual scenarios that might be proved in support of its claims. Therefore, the sufficiency of plaintiff's claim as stated in its complaint, reframed in its pretrial filings, or constructed in response to defendant's arguments is judged by measuring all facts thus far identified against the legal components of a given cause of action.

## II. *The scope of I.R.C. § 48(l)(3)(A)(iv)*

During 1984, the tax year in question, section 48(*l*) permitted business taxpayers to deduct a business energy credit of 10 percent with respect to an investment in one of several classes of qualifying energy property. This group of qualifying energy properties included a classification under section 48(*l*)(3) known as "alternative energy property," which is the subject of this case. Section 48(*l*)(3)(A)(i)–(ix) provides the definition of "alternative energy property;" there are nine types of equipment listed which qualify for the business ener-

---

**2.** The provenance of the *Branning* standard, although not traceable to the cases cited, is legitimate. *Bloor* quotes *George C. Frey Ready–Mixed Concrete, Inc. v. Pine Hill Concrete Mix Corp.*, 554 F.2d 551, 553 (2d Cir.1977), for the standard that a motion will not be granted unless " 'the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' " In turn, the Second Circuit cites *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957), the hallmark case on the standards for a motion to dismiss: A "complaint

should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Conley* has been lionized only in connection with motions to dismiss. However, applying the *Conley* standard to a motion for judgment on the pleadings makes sense because such a motion is for all practical purposes a motion to dismiss when offered up by defendant after the answer has been filed, rather than before.

gy credit. In this case the parties focus on section 48(*l*)(3)(A)(iv), the subsection which most conceivably could apply to plaintiff's slurry pipeline. In denying the business energy credit to plaintiff, the Commissioner stated that the statute's plain meaning dictated such a result in plaintiff's case. Plaintiff contends that this interpretation is simplistic and unreasonably narrow.

I.R.C. § 48(*l*)(3) provides, in pertinent part:

(3) **Alternative Energy Property**

(A) **In general.** The term "alternative energy property" means

(i) a boiler the primary fuel for which will be an alternate substance,

(ii) a burner (including necessary on-site equipment to bring the alternate substance to the burner) for a combustor other than a boiler if the primary fuel for such burner will be an alternate substance,

(iii) equipment for converting an alternate substance into a synthetic liquid, gaseous, or solid fuel,

(iv) equipment designed to modify existing equipment which uses oil or natural gas as a fuel or as feedstock so that such equipment will use either a substance other than oil and natural gas, or oil mixed with a substance other than oil and gas (where such other substance will provide not less than 25 percent of the fuel or feedstock),

(v) equipment to convert—

(I) coal (including lignite), or any non-marketable substance derived therefrom, into a substitute for a petroleum or natural gas derived feedstock for the manufacture of chemicals or other products, or

(II) coal (including lignite), or any substance derived therefrom, into methanol, ammonia, or a hydroprocessed coal liquid or solid,

(vi) pollution control equipment required (by Federal, State, or local regulations) to be installed on or in connection with equipment described in clause (i), (ii), (iii), (iv), or (v),

(vii) equipment used for the unloading, transfer, storage, reclaiming from storage, and preparation (including, but not limited to, washing, crushing, drying, and weighing) at the point of use of an alternate substance for use in equipment described in clause (i), (ii), (iii), (iv), (v), or (vi),

(viii) equipment used to produce, distribute, or use energy derived from a geothermal deposit (within the meaning of section 613(e)(3)), but only, in the case of electricity generated by geothermal power, up to (but not including) the electrical transmission stage, and

(ix) equipment, placed in service at either of 2 locations designated by the Secretary after consultation within the Secretary of Energy, which converts ocean thermal energy to usable energy. The equipment described in clause (vii) includes equipment used for the storage of fuel derived from garbage at the site at which such fuel was produced from garbage....

III. *Statutory interpretation*

1. The key issue in this case is the proper interpretation of § 48(*l*)(3)(A)(iv), in particular, the use of the words "modify" and "equipment."

 In questions of statutory construction, the court looks first to the plain meaning of the statutory language, then to other extrinsic aids, such as legislative history, rules of statutory construction, and the construction placed on the statute by the agency which administers it, the ultimate objective being to discern, if possible, the intent of Congress. *Johns–Manville Corp. v. United States,* 855 F.2d 1556, 1559 (Fed.Cir.1988). "The starting point in every case involving construction of a statute is the language itself...." *Watt v. Alaska,* 451 U.S. 259, 265, 101 S.Ct. 1673, 1677, 68 L.Ed.2d 80 (1981) (citations omitted). The assumption is that the ordinary meaning of that language accurately expresses the legislative purpose. *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.,* 469 U.S. 189, 194, 105 S.Ct. 658, 661, 83 L.Ed.2d 582 (1985). The Federal Circuit has applied in tax cases the Supreme Court's direction in *Caminetti v. United States,* 242 U.S. 470,

37 S.Ct. 192, 61 L.Ed. 442 (1917), that " '[w]here the language is plain and admits of no more than one meaning the duty of interpretation does not arise and the rules which are to aid doubtful meanings need no discussion.' " *Henry v. United States,* 793 F.2d 289, 293 (Fed.Cir.1986); *see also Texas State Comm'n for the Blind v. United States,* 796 F.2d 400, 406 (Fed.Cir.1986) (quoting *United States v. Turkette,* 452 U.S. 576, 580, 101 S.Ct. 2524, 2527, 69 L.Ed.2d 246 (1981)), *cert. denied,* 479 U.S. 1030, 107 S.Ct. 874, 93 L.Ed.2d 828 (1987). However, slavish adherence to plain meaning on a purely linguistic level is not required if the interpretation of unambiguous language does not do justice to the realities of the situation. *Texas State Comm'n,* 796 F.2d at 406.

■ Statutory interpretation of Internal Revenue Code provisions in particular involves looking at the plain meaning first, then examining legislative history to discern the intent of Congress where there is ambiguity in the statute. In *Shriners Hospitals for Crippled Children v. United States,* 862 F.2d 1561 (Fed.Cir.1988), the Federal Circuit refused to interpret a provision in contravention of Congress' intent to achieve a retroactive statute "for all purposes," requiring, among other things, the refund of interest paid on the amount of an estate tax that would have been due but for reformation under the statute. "Tax and interest payments are creatures of statute, and such statutory provisions are to be given their plainest reasonable meaning, in implementation of the discernable intent of Congress...." 862 F.2d at 1563. This same approach was followed in *Madison Galleries, Ltd. v. United States,* 870 F.2d 627 (Fed.Cir.1989). "Where the plain language of the statute would settle the question before the court, the legislative history is examined with hesitation to determine whether there is a clearly expressed legislative intention contrary of the statutory language.... Sometimes the literal language of some part of a statute may seemingly contradict the intent of the statute taken as a whole.... Absent a clear cut contrary legislative intent, the statutory language is ordinarily regarded as conclusive." 870 F.2d at 629–30.

The Federal Circuit has stated that a court should not look beyond the plain meaning of unambiguous language to divine the real purpose of Congress

unless a literal interpretation would lead to an incongruous result. For example, if a literal meaning of the statute would impute to Congress an irrational purpose, *United States v. Bryan,* 339 U.S. 323, 338 [70 S.Ct. 724, 734, 94 L.Ed. 884] (1950), or would thwart the obvious purpose of the statute, *Trans Alaska Pipeline Rate Cases,* 436 U.S. 631, 643 [98 S.Ct. 2053, 2061, 56 L.Ed.2d 591] (1978), or would lead to a result at variance with the policy of the legislation as a whole, *Trustees of Indiana University v. United States,* 223 Ct.Cl. 88, 94, 618 F.2d 736, 739 (1980), then the literal interpretation will be eschewed in favor of resort to the legislative history to ascertain the intent of the Congress. *United States v. Oregon,* 366 U.S. 643, 648 [81 S.Ct. 1278, 1281, 6 L.Ed.2d 575] (1961).

*Reid v. Dept. of Commerce,* 793 F.2d 277, 281–82 (Fed.Cir.1986).

■ In view of these canons of statutory interpretation, the tax provisions in this case must be construed harmoniously and in a manner to give effect to all their terms. A narrow construction of a statute should not be permitted if it discourages the specific action the statute was designed to promote. The Supreme Court stated: "All laws are to be given a sensible construction. A literal application of a statute which would lead to absurd consequences is to be avoided whenever a reasonable application can be given which is consistent with the legislative purpose." *United States v. Ryan,* 284 U.S. 167, 175, 52 S.Ct. 65, 68, 76 L.Ed. 224 (1931) (citations omitted).

■ 2. In the late 1970's, Congress was concerned that both the economy and national security were threatened by excessive reliance on imported oil. S.Rep. No. 95–529, 95th Cong., 1st Sess. 3 (1977) [hereinafter S.Rep. No. 95–529], U.S.Code Cong. & Admin.News 1978, pp. 7659, 7943. At

that time the United States was importing nearly half of its oil and thousands of workers had been laid off their jobs because their employers could not obtain natural gas. S.Rep. No. 95–529 at 6. Congress decided that immediate action was necessary to reduce demand for imported oil and to increase domestic supply of oil and natural gas. *Id.* Thus, Congress enacted the Energy Tax Act of 1978, Pub.L. No. 95–618, 92 Stat. 3174 (1978) (the "Act"). In its report the Senate Finance Committee stated that the purpose of this legislation was to lessen United States consumption of oil and natural gas by creating tax incentives such as a business energy credit. S.Rep. No. 95–529 at 74–75. The Act created tax incentives for businesses to conserve energy and encourage the conversion from oil and natural gas to the development of alternative domestic energy sources. The Committee stated that the legislation was intended to promote several policy goals: "[to] curtail the growth in demand for imported oil, encourage conservation of oil and gas, increase domestic production of energy, and accelerate the shift to more abundant domestic sources of energy." S.Rep. No. 95–529 at 6, U.S.Code Cong. & Admin.News 1978, at 7945.

Section 48(*l*) was enacted as part of this Act. As previously noted, it permitted business taxpayers to deduct a business energy credit of 10 percent with respect to an investment in one of several classes of qualifying energy property. This group of qualifying energy properties included a classification under I.R.C. § 48(*l*)(3) termed "alternative energy property"—the subject of this case. Section 48(*l*)(3) subsequently was repealed by Congress in the Omnibus Budget Reconciliation Act of 1990, Pub.L. No. 101–508, § 11813(a), 104 Stat. 1388, 1388–541—543 (1990).

Defendant asserts that I.R.C. § 48(*l*)(3)(A)(iv) is straightforward and should be read narrowly. The key words of interpretation are "equipment" and "modify." According to defendant, plaintiff incorrectly interprets the definition of the word "modify" in the statute to include "replace" or "substitute." Defendant argues that the phrase "equipment designed to modify existing equipment" cannot include plaintiff's slurry pipeline because it did not modify the existing equipment, *i.e.,* the trucks, but, instead, replaced the equipment with something else, *i.e.,* the pipeline. Thus, the slurry pipeline constitutes new equipment constructed by plaintiff to replace existing equipment. Defendant points out that plaintiff's diesel trucks were not changed at all by the construction of the pipeline and continue to run on diesel fuel, although they are no longer used by plaintiff to transport clay from the mines.

In addition, defendant argues that plaintiff's interpretation of "equipment" calls for a broader meaning than Congress intended. Defendant reads the term "existing equipment" in I.R.C. § 48(*l*)(3)(A)(iv) to mean only those items that were in existence at the time of the modification. This would bar plaintiff's pipeline because it was constructed to replace the existing equipment, *i.e.,* the trucks, and was not in existence previously.

Plaintiff rejoins that defendant's interpretation of section 48(*l*)(3)(A)(iv) is overly narrow and contrary to the broader policy goals intended by Congress. Plaintiff argues that replacing the diesel trucks with a slurry pipeline constituted a "modification." Because the statute does not provide a definition of the word "modify," legislative intent is critical to interpreting the language of I.R.C. § 48(*l*)(3)(A)(iv). In plaintiff's view defendant fails to appreciate Congress' intention to provide incentives to replace the use of oil with alternative energy sources. The Act consequently called for a variety of means to reduce oil and natural gas consumption. As for the meaning of the word "equipment," plaintiff asserts that it should be read to include its entire equipment. Although section 48(*l*)(3) does not define "equipment," plaintiff argues that the term is sufficiently used in other parts of the provision, as well as in the applicable Treasury Regulation, to support the construction that "equipment" is broad in scope and includes "facility." Alternatively, plaintiff contends that the lack of a definition for "equipment" renders section 48(*l*)(3)(A) ambiguous and that

the Act's legislative history should be considered in order to find out what Congress intended the word to mean.

3. The meaning of "modify," as defined by Webster's II New Riverside University Dictionary (1984), is

1. to change in form or character: ALTER 2. To make less extreme, severe, or strong. 3. To qualify or limit the meaning of, e.g., chilly modifies wind in a chilly wind. 4. To change ... to be or become modified.

Plaintiff asserts that the word "modify" has an inherent ambiguous quality, citing *Wisconsin Electric Power Co. v. Reilly,* 893 F.2d 901 (7th Cir.1990). The issue in *Wisconsin Electric Power* involved the Environmental Protection Agency (the "EPA"), which was required by Congress to promulgate regulations for programs related to the Clean Air Act, 42 U.S.C. §§ 7401–7642 (1982). In doing so, the EPA created modification standards for determining whether any physical or operational change to an existing facility resulting in an increase in the emission rate to the atmosphere of any pollutant to which the standard applies constitutes a modification. The EPA soon found that "the potential reach of these modification provisions is apparent: the most trivial activities—the replacement of leaky pipes, for example— may trigger the modification provisions if the change results in an increase in the emissions of a facility." 893 F.2d at 904. As a result, the EPA promulgated specific exceptions to the modification provisions. The taxpayer, Wisconsin Electric Power Company ("WEPCO"), made proposed renovations to its Port Washington power plant that the EPA determined were modifications and would subject WEPCO to certain pollution control provisions of the Clean Air Act. The court set aside the EPA's determination, ruling that the EPA's reliance on an assumed continuous operation as a basis for finding an emissions increase was not supported properly. More relevant to the case at bar, the court also concluded that in order to give effect to the legislative history behind the Clean Air Act, the term "modify" should be interpreted to include fundamental changes.

In this case the pertinent legislative history is that of the Energy Tax Act of 1978. That the word "modify" was considered ambiguous in the context of the Clean Air Act is not dispositive of this case.

4. The meaning of "equipment," as defined by Webster's II New Riverside University Dictionary (1984), is

1. The act of equipping or state of being equipped. 2. Something with which one is equipped. 3.a. The rolling stock of a railroad. b. A single piece of such equipment. 4. The qualities or traits that make up the mental and emotional resources of an individual.

According to plaintiff, existing equipment "includes within its scope not only discrete items of equipment (e.g. trucks) but also 'existing facilities.'" Plf's Br. filed June 16, 1992, at 8.

Plaintiff reaches this conclusion through a labyrinth of steps: First, plaintiff notes that I.R.C. § 48(*l*)(3)(A)(iv) fails to provide a definition of "existing equipment" and substitutes a definition of this phrase found in section 48(*l*)(10).[3] Second, plaintiff applies the definition of "existing" found in section 48(*l*)(10) to section 48(*l*)(5), which defines "specially defined energy property" and refers to "any existing industrial and commercial process" and to "an existing industrial and commercial facility."[4] Third, plaintiff notes that in

---

**3.** I.R.C. § 48(*l*)(10) provides, as follows:

(10) Existing.—For purposes of this subsection, the term existing means—
(A) when used in connection with a facility, 50 percent or more of the basis of such facility is attributable to construction, reconstruction, or erection before October 1, 1978, or
(B) when used in connection with an industrial or commercial process, such process was carried on in the facility as of October 1, 1978.

**4.** I.R.C. § 48(*l*)(5) provides in full:

(5) Specially defined energy property.—The term "specially defined energy property" means—
(A) a recuperator,
(B) a heat wheel,
(C) a regenerator,
(D) a heat exchanger,
(E) a waste heat boiler,
(F) a heat pipe,

defining "existing" in connection with "facility," section 48(*l*)(10)(A) dropped the section 48(*l*)(5) language in referring to an "industrial and commercial process." Finally, plaintiff concludes that this omission of use of the term "facility" was intended to accommodate the phrase "existing equipment" in section 48(*l*)(3)(A)(iv) in those cases where "existing equipment" properly referred to an "existing facility." Plf's Br. filed June 16, 1992, at 9.

Plaintiff also asserts that the applicable Treasury Regulation supports its position that the phrase "existing equipment" in I.R.C. § 48(*l*)(3)(A)(iv) includes an "existing facility." Treas.Reg. § 1.48–9(*l*)(1)(i), 26 C.F.R. § 1.48–9 (1984), provides, in pertinent part:

> For purposes of section 48(*l*), the term "existing" means
>
> (i) When used in connection with a facility or equipment, 50 percent or more of the basis of that facility or equipment is attributable to construction, reconstruction, or erection before October 1, 1978, or
>
> (ii) When used in connection with an industrial or commercial process, that process was carried on in the facility as of October 1, 1978.

Plaintiff takes the position that the regulation explicitly provides that the term "existing" as defined under I.R.C. § 48(*l*)(10) refers not only to an "existing industrial and commercial facility" under I.R.C. § 48(*l*)(5), but also to "existing equipment" under I.R.C. § 48(*l*)(3)(A)(iv) whenever a reference to an "existing facility" is intended.

Plaintiff also cites to the legislative history of the Energy Tax Act of 1978 as supportive of its interpretation. The Senate Finance Committee referred to alternative energy property as including "equipment which modifies an existing facility to replace the use of oil or natural gas as a fuel or feedstock...." S.Rep. No. 95–529 at 14, U.S.Code Cong. & Admin.News 1978, at 7953. "Generally, the 40 percent refundable credit is allowed for investments in new property which either directly (for example, coal-fired boilers) or indirectly (for example, certain pollution control equipment) relate to the installation by industrial firms and electric utilities of equipment or facilities that will make possible shifts from oil and natural gas to other fuels." S.Rep. No. 95–529 at 74, U.S.Code Cong. & Admin.News 1978, at 8007.

In short, the main thrust of plaintiff's argument is that because Congress could not have construed every circumstance or item that would qualify under the business energy credit, I.R.C. § 48(*l*)(3)(A)(iv) must be construed broadly. The statute should be accorded its "intended flexibility," Plf's Br. filed June 16, 1992, at 11, as seen by the legislative history. Section 48(*l*)(5) enumerates 13 different types of "specially defined energy property" in I.R.C. § 48(*l*)(5)(A–M). It also lists as "specially defined energy property" under section 48(*l*)(5)(N): "any other property of a kind specified by the Secretary by regulations, the principal purpose of which is reducing the amount of energy consumed in any industrial or commercial process and which is installed in connection with an existing industrial or commercial facility...." Plaintiff asserts that this "catch-all" section is indicative of the intended flexibility of the statute.

Plaintiff relies on *Griffin Industries, Inc. v. United States*, 27 Fed.Cl. 183 (1992). In *Griffin* a taxpayer sought refund of income taxes and interest, alleging that it

----

(G) an automatic energy control system,
(H) a turbulator,
(I) a preheater,
(J) a combustible gas recovery system,
(K) an economizer,
(L) modifications to alumina electrolytic cells,
(M) modifications to chlor-alkali electrolytic cells, or
(N) any other property of a kind specified by the Secretary by regulations, the principal purpose of which is reducing the amount of energy consumed in any existing industrial or commercial process and which is installed in connection with *an existing industrial or commercial facility.* The Secretary shall not specify any property under subparagraph (M) unless he determines that such specification meets the requirements of paragraph (9) of section 23(c) for specification·of items under section 23(c)(4)(A)(viii).
(Emphasis added.)

was entitled to a 10–percent business energy investment credit on certain rendering recovery equipment as provided for by I.R.C. §§ 38 and 46. Trial was held to determine the validity and application of Treas.Reg. § 1.48–9(g)(1)(1981), the outcome of which was determinative of plaintiff's entitlement to the credit. The court examined the legislative history underlying the relevant provisions and concluded that the IRS' interpretation of the business energy investment credit was too narrow and was inconsistent with congressional intent. Specifically, the court ruled that the definition of "recycling" under the business energy investment tax credit statute did not exclude processes that do not result in similar end product; common usage of the word "recycling" brings to mind a process whereby products that have no other economic use in present form are transformed into valuable, useful products, regardless of their form. The court held that plaintiff's kitchen grease and animal parts qualified as "solid waste" for the purposes of the business energy investment credit regardless of whether the amount of liquid in waste was measured at the time it was loaded into the receiving bin or when it was loaded into plaintiff's equipment. 27 Fed. Cl. at 198. It was clear to the court that the IRS' interpretation was far too narrow. The same cannot be said of this case.

Plaintiff sponsors the interpretation that its pipeline fits under the statute's definition of "equipment." In this sense the term "existing equipment" applies not only to the trucks, but also to plaintiff's "existing facility" by which it previously transported the kaolin from its mines to its plant. Plaintiff contends that the legislative intent underlying the statute calls for the term "existing facility" to include plaintiff's entire transportation facility, including "the roadway over which the trucks traveled as well as the equipment and structures necessary to effect the movement of the Kaolin by trucks." Plf's Br. filed June 16, 1992, at 11. Under this scenario plaintiff modified its then existing "transportation facility" by converting from the use of diesel powered trucks oper-

ating over public roads to a more energy efficient pipeline system.

The main problem with plaintiff's interpretation of "equipment" is that there is no stopping point. As defendant argues, plaintiff's interpretation would include not only trucks, but loading docks, unloading equipment, conveyor belts, augers, and storage facilities, as well as the public roads over which the trucks drove. No identifiable piece of equipment exists that is not itself part of some larger array of equipment or facility. To be sure, under such an interpretation, replacement of the diesel trucks with a surrey pipeline is a "modification" of a transportation facility, *i.e.*, equipment.

A review of the list of types of alternative energy property (I.R.C. § 48(*l*)(3)) and specially defined energy property (I.R.C. § 48(*l*)(5)) shows that Congress did put considerable thought into enumerating specific types of property that it intended to qualify for the business energy credit. For example, had plaintiff's equipment involved a boiler, then the business energy tax credit would apply because a boiler qualifies as alternate energy property under I.R.C. § 48(*l*)(3)(A)(i). Similarly, if plaintiff's equipment involved a burner, then the business energy tax credit would apply because "burner" is defined as alternative energy property under section § 48(*l*)(3)(A)(ii). The business energy tax credit also applies to "equipment for converting an alternate substance into a synthetic liquid, gaseous, or solid fuel," because such equipment is defined as alternative energy property under section 48(*l*)(3)(A)(iii). Congress clearly provided in these subsections for alternative energy property.

In contrast, plaintiff posits that Congress intended to recognize that, if plaintiff built a new processing plant on the site of his clay pit (thus eliminating the need for transportation of the clay), plaintiff's plant would qualify as an "alternative energy property" because it "modified," *i.e.*, replaced, the equipment, thereby saving energy. This interpretation reaches beyond the plain meaning of the Act. Had Congress intended to allow the business energy cred-

it for the type of property constructed by plaintiff, that intention could have been expressed in the Act, as it was with the 13 other specific types of property. By replacing diesel trucks with a slurry pipeline, plaintiff saved considerable energy and costs, which is commendable. However, Congress did not provide that every imaginable activity that saves oil or natural gas can be construed as a business energy credit under the Energy Tax Act of 1978.

The Court of Federal Claims recently dealt with another case involving statutory interpretation of an I.R.C. provision. The taxpayer in *Mobil Exploration and Producing North America, Inc. v. United States,* 27 Fed.Cl. 463 (1993), claimed a refund which hinged on a close examination of several interlocking sections and Treasury Regulations. The court focused on statutory interpretation of what the key term—"independent producer"—was intended to mean in the relevant provisions. Defendant's construction of the pertinent provision was adopted since it gave the most literal and plain meaning effect to its phrasing and was consistent with congressional intent. The court stated:

> Inevitably, the parties and the court must construe the meaning of the words in question and attempt thereby to arrive at what Congress meant. The legislative body is presumed to mean what it says, and only if literal meaning makes too great a departure from reason should we resort to our own speculations from evidence of concealed intent reflected in secondary materials.

*Mobil Exploration,* 27 Fed.Cl. at 468 n. 6.

In this case a literal interpretation of I.R.C. § 48(*l*)(3)(A)(iv) yields the most reasonable result consistent with congressional intent. A plain language interpretation of section 48(*l*)(3)(A)(iv) would read as follows: Qualifying property is that which alters, adjusts or changes, *i.e.,* modifies, already existing equipment whereby that equipment which previously burned oil or natural gas now burns less oil or natural gas or something else altogether.

## CONCLUSION

Accordingly, based on the foregoing, defendant's motion to dismiss, treated as a motion for judgment on the pleadings, is granted. The Clerk of the Court shall dismiss the complaint.

IT IS SO ORDERED.

No costs.