**BUFFALO BILLS, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 93–272T.

United States Court of Federal Claims.

Aug. 31, 1994.

Andrew H. Friedman, Washington, DC, for plaintiff. Jeffrey C. Littmann, Buffalo Bills, Inc., Detroit, MI, and Jerome D. Sorkin, Covington & Burling, Washington, DC, of counsel.

Thomas D. Sykes, Washington, DC, with whom was Asst. Atty. Gen. Loretta C. Argrett, for defendant. David Gustafson, Dept. of Justice, Tax Div., Washington, DC, of counsel.

## OPINION

NETTESHEIM, Judge.

This case is before the court after argument on cross-motions for summary judgment on the issue of liability. Plaintiff filed this action seeking a tax refund for federal employment taxes and related interest for the taxable years 1984 through 1986. The two issues calling for resolution are whether plaintiff could defer compensation to football players in a manner such that employment taxes should not be levied on the deferred amount and whether severance payments made to certain players were exempt from these taxes because they were paid on account of retirement.

### FACTS

The parties stipulated to the following facts. The Buffalo Bills, Inc. ("plaintiff" or the "Buffalo Bills"), owns and operates the Buffalo Bills professional football club, a New York corporation with a principal place of business in New York and executive offices in Detroit, Michigan. The Buffalo Bills is a member of the National Football League (the "NFL"). This is a suit for return of federal employment taxes and related interest. The taxes involved are those imposed upon every employer by the Federal Insurance Contributions Act, 26 U.S.C. §§ 3101–3128 (1988) ("FICA"), and the Federal Unemployment Tax Act, 26 U.S.C. §§ 3301–3311 (1988) ("FUTA").

On December 11, 1982, a body representing the NFL, the National Football League Management Council (the "NFLMC"), and a body representing NFL football players, the National Football League Players Association (the "NFLPA"), signed a collective bargaining agreement (the "1982 CBA"). The NFLMC and NFLPA had previously adopted the Bert Bell NFL Player Retirement Plan (the "Bert Bell Plan"), which was in effect during 1983 through 1986. This plan entitled former NFL players or their beneficiaries to certain benefits, including payments for retirement, permanent disability, and death benefits.

Article XXIV of the 1982 CBA, entitled "SEVERANCE PAY," became effective on November 16, 1982, and provided that NFL member clubs could make "severance payments" to players who had both completed two or more "Credited Seasons" under the Bert Bell Plan and ceased playing professional football. The Bert Bell Plan defined a "Credited Season" as a regular season during which a player is active for three or more games. The amount of severance pay depended on the number of years of NFL service and the year in which the player discontinued playing professional football.

The NFLMC and the NFLPA entered into a Settlement Agreement on October 26, 1983, which included an interpretation of article XXIV of the 1982 CBA. The agreement provided that a player intending to retire permanently from professional football must submit a letter to the last NFL team with which he was affiliated expressing his intent to retire. Additionally, the player had to execute a demand note requiring, among other things, that he would return the full amount of the severance payment should he return to playing professional football within 12 months of receiving the severance payment. The settlement agreement prohibited

a player from either actually playing professional football or entering a contract for future play between the end of his last NFL season and receipt of the severance payment. However, players could work for a club in a non-playing capacity and still be entitled to the severance payment. Generally, players who receive severance payments are between the ages of 20 and 40 years.

A portion of the severance payments made by plaintiff in 1984–1986 was attributable to services rendered before 1984 (for FICA purposes) or 1985 (for FUTA purposes). From 1984 to 1986, plaintiff paid 28 eligible former players severance payments. At the time these payments were made, plaintiff included the severance payments as "wages" for federal employment tax purposes, withheld the players' FICA tax, and paid the employer's FICA and FUTA taxes.

Generally, NFL teams compensate their players through regular weekly or biweekly salary payments during the regular NFL season. During 1983–1986 the regular NFL season spanned from September to December. Plaintiff entered into agreements with several of its players to pay a portion of their salaries in the year following the NFL regular season wherein the salaries were earned. Plaintiff compensated these players between January 2 and February 14 of the year following the players' performance. During 1984–1986 plaintiff compensated several of its players in this manner. Plaintiff included the payments as wages for FICA and FUTA purposes, withheld the players' FICA tax, and paid the employer's FICA and FUTA taxes for the payments when the payments were made.

Prior to the 1983, 1984, and 1985 seasons, plaintiff and several players also contracted to compensate the players with "incentive bonuses" conditioned upon the players' attaining specified, objective performance criteria on the field. These contractual agreements were addenda to the players' individual player contracts and were entered into before the players' performance. Both plaintiff and the players were aware that any incentive bonuses earned during the NFL regular season would be paid during the following calendar year. Between January 15 and February 11, 1984, through 1986, plaintiff paid incentive bonuses to players for performance during the prior NFL season. Again, when payments were made, plaintiff included the incentive bonuses as wages for FICA and FUTA purposes, withheld the players' FICA tax, and paid the employer's FICA and FUTA taxes.

On January 13, 1988, plaintiff filed for a refund of federal employment taxes paid during 1984–86, plus interest, with the Office of the District Director of Internal Revenue Service (the "IRS") in Detroit, Michigan (the "Detroit office"). The agent working on plaintiff's refund sought technical advice from the National Office of the IRS. On September 18, 1990, the IRS issued a Technical Advice memorandum denying plaintiff's refund of FICA/FUTA taxes paid on the deferred regular season salaries and incentive bonuses. The Technical Advice memorandum also denied the refund request for payments made to retired NFL players. On May 23, 1991, the Detroit office gave plaintiff a partial refund for FICA/FUTA taxes involving long-term deferrals of regular season salary payments and for severance payments that it found attributable to post–1983 for FICA or post–1984 for FUTA performance and disallowed the remaining claims. By letter dated June 21, 1991, plaintiff protested the Detroit office's disallowance of the remaining claims. The IRS issued a formal notice of disallowance of plaintiff's refund request on September 3, 1992. On May 14, 1993, plaintiff filed this suit; thereafter, plaintiff moved for summary judgment in its favor.

**DISCUSSION**

Plaintiff seeks a refund of employment taxes paid under certain sections of the Internal Revenue Code of 1954, 26 U.S.C. §§ 3101–3128, 3301–3311 (1988) (the "I.R.C."). Plaintiff bases its claim on two theories. First, plaintiff argues that certain salary payments and incentive bonuses are exempt from the FICA/FUTA wage base because they were paid pursuant to a nonqualified deferred compensation plan or arrangement under I.R.C. §§ 3121(v)(2) and 3306(r)(2). For purposes of FICA/FUTA, such payments are

taken into account either when the services are performed or when there is no substantial risk of forfeiture of the rights to such payments. The payments at issue were included in the FICA/FUTA wage base when they were paid, not when the services were performed. Accordingly, plaintiff argues that it is entitled to a refund of FICA/FUTA taxes on these payments. Second, plaintiff argues that certain severance payments qualified as payments made "on account of retirement" and should be excluded from the FICA/FUTA wage base under former I.R.C. §§ 3121(a)(2)(A) and 3306(b)(2)(A).

### 1. *Nonqualified deferred compensation*

■ Plaintiff argues that the salary and bonus payments at issue represent nonqualified deferred compensation plans under section 3121(v)(2).[1] Section 3121(v)(2), provides, in pertinent part:

(v) Treatment of certain deferred compensation and salary reduction arrangements.—

....

(2) Treatment of certain nonqualified deferred compensation plans.—

(A) In general.—Any amount deferred under a nonqualified deferred compensation plan shall be taken into account for purposes of this chapter as of the later of—

(i) when the services are performed, or

(ii) when there is no substantial risk of forfeiture of the rights to such amount.

26 U.S.C. § 3121(v)(2). A nonqualified deferred compensation plan is "any plan or other arrangement for deferral of compensation other than a plan described" in I.R.C. § 3121(a)(5). *Id.* Section 3121(a)(5) describes a qualified deferred compensation plan as "one in which payments are made to an employee from certain trusts, annuity plans, pensions, exempt government deferred compensation plans, supplemental pension benefits, and 'cafeteria plans' subject to certain qualifications...." *Hoerl & Assocs. v.*

*United States,* 996 F.2d 226, 228 (10th Cir. 1993); *see* 26 U.S.C. § 3121(a)(5).

Plaintiff argues that the outcome of this case is controlled by the plain meaning of section 3121(v)(2). Specifically, it is plaintiff's position that the employment contracts pertinent to this case describe plans for the deferral of compensation from one tax year to the next. Such contracts represent nonqualified deferred compensation plans because they evidence a "plan or other arrangement" for the deferral of compensation. The NFL Player Contract between the athlete Tony Hunter and plaintiff is illustrative. Clause 6 of this standard NFL contract provides that the yearly salary, *i.e.,* $175,000.00 for Tony Hunter, be paid in equal weekly or bi-weekly installments over the course of the football season. Clause 24b of the contract further provides that "[n]otwithstanding Payment Provisions of Paragraph # 6, the sum specified in Paragraph # 5 will be paid as follows: $100,000.00 during the regular season and the sum of $75,000.00 deferred to and paid on January 15, 1984." This sample contract is not described by any of the qualified deferred compensation vehicles listed in I.R.C. § 3121(a)(5). According to plaintiff, the Hunter contract represents a "classic" nonqualified deferred compensation plan within the plain meaning of section 3121(v)(2).

■ "The starting point in every case involving construction of a statute is the language itself...." *Watt v. Alaska,* 451 U.S. 259, 265, 101 S.Ct. 1673, 1677, 68 L.Ed.2d 80 (1981) (citations omitted). "Where the language is plain and admits of no more than one meaning, the duty of interpretation does not arise and the rules which are to aid doubtful meanings need no discussion...." *Caminetti v. United States,* 242 U.S. 470, 485, 37 S.Ct. 192, 194, 61 L.Ed. 442 (1917). It is strongly presumed that the statutory language most accurately expresses the legislative purpose. *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.,* 469 U.S. 189, 194, 105 S.Ct. 658, 661, 83 L.Ed.2d 582 (1985). These principles of construction have been adopted by the Federal Circuit. *See, e.g., Johns–Man-*

---

**1.** The language of I.R.C. §§ 3121(v) and 3306(r) is identical and the analysis is the same for FICA and FUTA purposes. Accordingly, part 1 of this opinion refers only to I.R.C. § 3121(v).

*ville Corp. v. United States,* 855 F.2d 1556, 1559 (Fed.Cir.1988), *cert. denied,* 489 U.S. 1066, 109 S.Ct. 1342, 103 L.Ed.2d 811 (1989); *Henry v. United States,* 793 F.2d 289, 293 (Fed.Cir.1986).

■ "Where the plain language of the statute would settle the question before the court, ... [extrinsic materials are] examined with hesitation to determine whether there is a clearly expressed legislative intention contrary to the statutory language...." *Madison Galleries, Ltd. v. United States,* 870 F.2d 627, 629 (Fed.Cir.1989). "Absent a clear cut contrary legislative intent, the statutory language is ordinarily regarded as conclusive." *Id.* at 630. However, the construction of statutory language should not lead to absurd results. *Texas State Comm'n for the Blind v. United States,* 796 F.2d 400, 406 (Fed.Cir. 1986), *cert. denied,* 479 U.S. 1030, 107 S.Ct. 874, 93 L.Ed.2d 828 (1987). "Moreover, even where a statute is clear on a purely linguistic level, interpretation may be necessary if that interpretation does not do justice to the realities of the situation." *Id.* "Finally, if there is a doubt as to the meaning of the provisions of the Internal Revenue Code, the doubt 'must be resolved in favor of the taxpayer.' ...." *Ocean Drilling & Exploration Co. v. United States,* 24 Cl.Ct. 714, 734 (1991), *aff'd,* 988 F.2d 1135 (Fed.Cir.1993) (quoting *Citizens Nat'l Bank of Waco v. United States,* 551 F.2d 832, 213 Ct.Cl. 236, 255 (1977)) (citing *Porter v. Commissioner,* 288 U.S. 436, 442, 53 S.Ct. 451, 453, 77 L.Ed. 880 (1933), and *United States v. Merriam,* 263 U.S. 179, 188, 44 S.Ct. 69, 71–72, 68 L.Ed. 240 (1923)).

Defendant advances four arguments in support of its theory that section 3121(v)(2) should not be given a literal construction. First, defendant argues that adherence to the plain meaning of section 3121(v)(2) would lead to absurd results, contrary to the intent of Congress. Specifically, defendant contends that a literal reading of "deferral" in section 3121(v)(2) would "encompass *any* delay between the time the services are performed and the time actual payment ... is made." Def's Br. filed Apr. 13, 1994, at 25 (emphasis in original). Thus, all remuneration could be converted into "deferred compensation" for purposes of the act. *Id.* For example, defendant posits that a federal employee paid bi-weekly for work performed the previous two weeks would satisfy the literal terms of section 3121(v)(2). Defendant argues that Congress could not have intended that section 3121(v)(2) reach every payment scheme involving a delay. This concern is not well-founded.

Defendant overlooks the "plan or other arrangement" requirement of section 3121(v)(2). The Hunter contract, as well as the other NFL contracts included in the record, facially contemplate a "plan or other arrangement" for the deferral of compensation. Where parties to a contract negotiation deliberately depart from the customary payment scheme in order to effect a deferral, they have created a plan or other arrangement. In this case clause 24b of the Hunter contract represents a deliberate departure from the customary payment scheme described in clause 6 of the contract. By contrast, the federal employee payment scheme discussed by defendant, while consensual, does not involve a negotiation wherein the parties deliberately crafted a compensation schedule designed to defer payment from one tax year to the next. The "absurd" result that so disturbs defendant does not obtain when section 3121(v)(2) is read in its entirety.

Defendant argues that the mere presence of a deliberate plan or other arrangement, such as that contemplated by the Hunter contract, does not necessarily avoid an absurd result. For example, a taxpayer may deliberately arrange for the deferral of salary payments only one day into the next tax year and still fall within the plain meaning of section 3121(v)(2). According to defendant, a one day deferral, whether intentionally planned or not, is "absurd" and thus presumptively contrary to the intent of Congress.

Defendant's proposal that an "absurdity" threshold exists in section 3121(v)(2) is not conceptually sound. Defendant itself cannot locate this threshold: "[Congress] didn't give much of a clue with regard to whether it should be a bright line, or anything else. But we know that it can not [sic] be what ... [plaintiff's counsel] says it should be. That is, any delay no matter how short, being

sufficient." Transcript of Proceedings, *Buffalo Bills, Inc. v. United States*, No. 93–272T, June 14, 1994, at 31 (Fed.Cl. July 8, 1994) (hereinafter "Tr."). The Hunter contract, discussed above, provides for a deferral payment 15 days into the following tax year. It is not clear how a 15–day deferral is absurd and a two and one-half month deferral, as defendant elsewhere urges, *see infra* pp. 10–11, is not. Defendant suggests that the location of the theoretical timeline is a function of facts and circumstances. Yet, defendant has not demonstrated when facts and circumstances create an absurd result and when they do not. The proposed timeline that defendant urges appears to exist only to the extent that it defeats this taxpayer's claim. This is not a principled construction of section 3121(v)(2).

*Hoerl*, 996 F.2d 226, upon which plaintiff relies, is the only reported court decision interpreting section 3121(v)(2). In *Hoerl* two psychologists, husband and wife, entered into an employment contract with their professional corporation (the taxpayer). The psychologists arranged to be paid only once every two years under employment contracts running from May 1 of Year One to May 1 of Year Three—with the lump-sum payments to be made in alternating years. Thus, the wife was paid $120,000.00 in Year One, while the husband was paid nothing; in Year Two, the husband was paid $160,000.00, while the wife was paid nothing; and so on. The arrange-

ment, if successful, would have allowed the couple and the corporation to halve their liabilities for FICA tax. The IRS argued that this arrangement constituted a nonqualified deferred compensation plan under section 3121(v)(2). The appeals court agreed, stating that "[t]o the extent it permits deferred payment of compensation, it is, then, a nonqualified plan by definition...." *Id.* at 228.

█ While factually dissimilar to the present case, *Hoerl* does suggest that a payment scheme need not satisfy a minimum deferral period in order to constitute a nonqualified deferred compensation plan under I.R.C. § 3121(v)(2).[2] This interpretation of I.R.C. § 3121(v)(2) appears particularly sound with respect to the salary payments and incentive bonuses at issue in the present case. The highly competitive nature of professional sports necessitates the structuring of salary schedules to protect against anticipated and unanticipated financial adversity. For example, the Hunter contract contains a "Skill, Performance and Conduct" clause, which provides:

> Player understands that he is competing with other players for a position on Club's roster within the applicable player limits. If at any time, in the sole judgment of Club, Player's skill or performance has been unsatisfactory as compared with that of other players competing for positions on

---

2. Interestingly, the IRS' argument in *Hoerl* appears remarkably similar to the "plain meaning" argument advanced by plaintiff. In *Hoerl* the IRS argued that the phrase "plan or other arrangement" was "clear and unambiguous:"

> Taxpayer's employment agreements ... constitute nonqualified deferred compensation plans because *they are arrangements that deliberately put off the payment of wages (compensation) from one tax period to another. Indeed the contracts here embody the classic concepts of tax deferral.... The compensation attributable to the services performed in the first year was not received until the second year.* And, this kind of deferred compensation arrangement is not in the statutory list of those exempt from FICA tax. Thus, taxpayer's employment agreements are clearly nonqualified compensation plans within the meaning of Section 3121(v)(2)(A).

Appellant's Brief at 21–25, *Hoerl* (Nos. 92–1133 & 92–1135) (10th Cir., filed Aug. 4, 1992) (emphasis added). Defendant now argues that com-

pensation deferred from one tax year to the next is not necessarily deferred compensation.

Defendant's about-face is not barred by the doctrine of judicial estoppel. "The judicial estoppel doctrine protects the integrity of the judicial process by preventing a party from taking a position inconsistent with one successfully and unequivocally asserted by the same party in a prior proceeding...." *Reynolds v. Commissioner of Internal Revenue*, 861 F.2d 469, 472 (6th Cir.1988). However, for this principle to apply, the party asserting it must demonstrate privity, reliance, and prejudice. *Jackson Jordan, Inc. v. Plasser American Corp.*, 747 F.2d 1567, 1579–80 (Fed.Cir.1984). The Buffalo Bills were not a party to the *Hoerl* lawsuit and thus do not satisfy the privity requirement. *Id.* at 1579. Moreover, plaintiff has not demonstrated personal reliance on the *Hoerl* decision or prejudice to its present lawsuit based on *Hoerl*. *Id.* at 1580. Thus, defendant's assertion of an inconsistent position in this case is not foreclosed.

Club's roster, or if Player has engaged in personal conduct reasonably judged by Club to adversely affect or reflect on Club, then Club may terminate this contract.

The length of a professional athlete's career depends upon his ability to outperform others who are themselves aggressively competing for coveted employment contracts. Consequently, professional athletes structure their payment schedule to ensure a degree of financial stability. To include these contractually arranged deferred payments in the FICA wage base would penalize a legitimate attempt to protect against the sometimes uncompromising realities of professional sports. Given the unique employment relationship between the Buffalo Bills and the professional athletes who comprise the team, the deferred compensation arrangements at issue here are not "absurd" for purposes of I.R.C. § 3121(v)(2).

Defendant further argues that I.R.C. § 404, which controls the timing of income tax deductions, and section 3121(v)(2) should be construed *in pari materia.*[3] Section 404 and the Treasury regulations promulgated thereunder, Treas.Reg. § 1.404(b)—1T, provide that any compensation paid within two and one-half months after the close of the year in which the work was performed cannot be deducted by the employer·as deferred compensation. Defendant argues that section 404 provides strong guidance regarding

a "reasonable" interpretation of section 3121(v)(2).

■ Defendant's analysis does not succeed for several reasons. First, Congress affirmatively declined to include a timeline in section 3121(v)(2). The presence of a timeline in section 404 and the absence of a timeline in section 3121(v)(2) unmistakably signal that Congress intended a timeline in one and not the other. If Congress had intended a timing requirement in section 3121(v)(2), it knew how to include one. Second, statutory provisions are to be construed *in pari materia* where they share a common purpose. *United States v. Riverside Bayview Homes, Inc.,* 474 U.S. 121, 139 n. 11, 106 S.Ct. 455, 465 n. 11, 88 L.Ed.2d 419 (1985). The income tax and employment tax chapters of the Code are structured to achieve quite separate goals. For this reason alone, the transfer of statutory requirements from one chapter to the other should not be made readily.[4]

Additionally, the language of section 3121(v)(2) itself effectively separates the operation of this provision from that of the income tax chapter. Section 3121(v)(2) specifically states that "[any] amount deferred under a nonqualified deferred compensation plan shall be taken into account *for purposes of this chapter....*" Defendant's attempt to transfer a technical requirement from one section of the Code to another under circumstances wherein Congress itself has expressly declined to do so undercuts defendant's professed adherence to legislative intent.[5]

---

**3.** Defendant adopts the analysis set forth in the Technical Advice Memorandum issued to plaintiff in this case. However, as defendant readily admits, *see* Tr. at 17, the Technical Advice Memorandum does not have the force of law. 26 U.S.C. § 6110(j)(3) (1988) ("Unless the Secretary otherwise establishes by regulations, a written determination may not be used or cited as precedent.")

**4.** Plaintiff further argues that a "decoupling provision" expressly precludes defendant from relying on income tax rules to interpret "wages" for employment tax purposes. *See* Pub.L. No. 98–21, § 327(b), 97 Stat. 127 (1983), codified in I.R.C. § 3121(a). The "decoupling" provision provides, in full: "Nothing in the regulations prescribed for purposes of Chapter 24 (relating to income tax withholding) which provides an exclusion from 'wages' as used in such chapter shall be construed to require a similar exclusion from 'wages' in the regulations prescribed for

purposes of this chapter." I.R.C. § 3121(a)(21). Section 3306(b)(16), concerning FUTA, contains an identical decoupling provision. However, the decoupling provision, by its terms, does not apply to I.R.C. § 3121(v)(2). As defendant correctly notes, "the restriction in the decoupling provision specifically refers to 'Chapter 24 (relating to income tax withholding)....' The deferred compensation provisions of the Code, however, are contained in Chapter 1." Def's Br. filed Apr. 13, 1994, at 29, n. 21.

**5.** Plaintiff argues that, even if the income tax rules were relevant, they would treat short-term deferrals as deferred compensation arrangements "effective to defer an employee's receipt of compensation for income tax purposes." Plf's Br. filed Feb. 23, 1994, at 15. Plaintiff cites several cases wherein short-term deferrals were held legitimate for income tax purposes under various circumstances. *See, e.g., Reed v. Commissioner,* 723 F.2d 138 (1st Cir.1983) (taxpay-

Defendant also contends that I.R.C. § 3121(v)(2), as an exception to a general rule, should be construed narrowly. *Temple Univ. v. United States,* 769 F.2d 126, 133 (3d Cir.1985) (" 'It is a well settled rule that statutory exemptions from taxation, being a matter of grace, are to be strictly and narrowly construed.'...") (citations omitted), *cert. denied,* 476 U.S. 1182, 106 S.Ct. 2914, 91 L.Ed.2d 544 (1986). While this rule of construction is sound, it does not aid defendant. Typically, a code provision should be construed narrowly by limiting the provision's scope to what it says. Defendant seeks to broaden the language of section 3121(v)(2) by reading into it a timeline measuring the deferral of salary payments. Defendant's proposed construction of section 3121(v)(2) expands, rather than narrows, the provision's meaning.

Finally, defendant cites the legislative history of I.R.C. § 3121(v)(2) for the vague proposition that Congress intended "deferral" to be "Much Greater Than The Delay Here." Def's Br. filed Apr. 13, 1994, at 27. The crux of defendant's argument is that the prepared statements of Senators Lloyd M. Bentsen and Bob Dole discuss section 3121(v)(2) in the context of "retirement." 129 Cong.Rec. 6134–35. Defendant argues that these references to retirement suggest that I.R.C. § 3121(v)(2) was intended to address the taxation of compensation flowing to retirees through retirement plans, with a view to protecting retirees' Social Security benefits from erosion by putting nonqualified deferred compensation plans on an equal footing with qualified deferred compensation plans. Compensation contributed to retirement plans ordinarily is not recovered for many years. Thus, defendant proceeds, Congress must have intended that section 3121(v)(2) contemplates a deferral period significantly greater than a "few weeks or months." Def's Br. filed Apr. 13, 1994, at 30.

These references to the legislative history of I.R.C. § 3121(v)(2) are not persuasive. The legislative history is devoid of any reference to a minimum deferral period in the context of section 3121(v)(2). The passing references to "retirement" in the congressional record do not, in and of themselves, invite recognition of a minimum deferral period in section 3121(v)(2) where one does not exist in the language of the provision. Even if "retirement" were the sole controlling principle underlying section 3121(v)(2) (a theory not convincingly pressed), defendant does not explain where and how a minimum deferral period is to be read into I.R.C. § 3121(v)(2) in any manner other than one that defeats plaintiff's claim. The prepared comments of Senators Dole and Bentsen do not support the judicial creation of a deferral period spanning "years, if not decades," in a provision the plain language of which does not mention either "retirement" or a minimum deferral period. Def's Br. filed May 31, 1994, at 7.

Defendant apparently concedes that the legislative record is far from clear about the presence or duration of a minimum deferral period in I.R.C. § 3121(v)(2). For example, defendant states that the legislative history "didn't give us a time frame, but we know that ... [plaintiff's] position, can not [sic] be the right one, because it's absurd....." Tr. at 22. Elsewhere, defendant states "What would Congress have intended? Well, they really didn't give much of a clue with regard to whether it should be a bright line, or anything else." Tr. at 31. In view of such statements, it is not the plain language of section 3121(v)(2) that is ambiguous, but the legislative history. Defendant's attempt to construe section 3121(v)(2) contrary to its plain meaning by reference to a legislative record that "didn't give much of a clue" is not persuasive.

Finally, arguing that the legislative history suggests a deferral period of "years, if not

er's sales contract effectively deferred the proceeds of the sale of stock from December 27, 1983, to January 3, 1984); *Schniers v. Commissioner,* 69 T.C. 511, 1977 WL 3725 (1977) (pursuant to binding contract, taxpayer deferred receipt of income from sale of cotton from December 4, 1973 to January 2, 1974); *Robinson v. Commis-* *sioner,* 44 T.C. 20, 25, 1965 WL 1138 (1965) (installment payment to boxer Sugar Ray Robinson paid on January 10, 1958 held to be "deferred compensation"). However, as already noted, the income tax chapter does not aid the task of interpreting I.R.C. § 3121(v)(2).

decades" directly contradicts defendant's *in pari materia* argument that a two and one-half month minimum deferral period can be "reasonably" read into section 3121(v)(2).

The taxpayer and the IRS both expect and are entitled to receive a reasonable degree of certainty in their tax planning. The ad hoc factual analysis urged by defendant in determining under section 3121(v)(2) when a given deferral period is appropriate and when it is not, introduces an unacceptable level of administrative and judicial confusion into the tax process. Such a scenario could not have been intended by Congress and is not required by the plain meaning of section 3121(v)(2).[6]

Defendant's various creative challenges to the plain meaning of I.R.C. § 3121(v)(2), do not overcome the strong presumption that unambiguous statutory language means what it says. *Madison Galleries*, 870 F.2d at 629–30. Accordingly, section 3121(v)(2) cannot be read to require a minimum deferral period, and plaintiff's claim for a tax refund must be granted.

### 2. Payments made "on account of retirement"

■ Plaintiff maintains that certain severance payments qualified as payments made "on account of retirement" under former I.R.C. §§ 3121(a)(2)(A) and 3306(b)(2)(A). Prior to the Social Security Act Amendments of 1983, payments made "on account of retirement" were excluded from the definition of "wages" for FICA and FUTA purposes.[7] Under the terms of the 1982 CBA and the October 1983 Settlement Agreement, a "severance payment" was made to an NFL player based on "the player's years of NFL service and the year in which ... [he] terminated his professional football playing career."[8] According to plaintiff, the term "retirement," as it is commonly understood, encompasses the termination of a professional football playing career. The phrase "on account of retirement" in former I.R.C. §§ 3121(a)(2)(A) and 3306(b)(2)(A) therefore describes the severance payments at issue and requires their exclusion from the FICA and FUTA wage base.

Plaintiff highlights the definition of "retirement" found in two dictionaries. Webster's

6. Defendant advances the ancillary argument that "deferred compensation" is a term of art purportedly possessing a technical meaning favorable to the Government. In support of this argument, defendant quotes the introductory sentences of chapter 5 of Michael D. Rose & June R. Chommie, *Federal Income Taxation* (3d ed. 1988) ("Federal Income Taxation"): "The purpose of a deferred compensation arrangement is twofold. First, it provides an employee with income upon retirement. Second, such an arrangement defers income to a time when the recipient's tax rate may be lower." *Federal Income Taxation* at 253. Defendant argues that the "salary and bonuses at issue provided no income 'upon retirement'— forcing one to question whether they should properly be regarded as 'deferred compensation'" under section 3121(v)(2). Def's Br. filed Apr. 13, 1994, at 24.
Defendant attempts to rewrite I.R.C. § 3121(v)(2) by reference to a secondary source that does not discuss section 3121(v)(2) nor any other provision of FICA. The test under section 3121(v)(2) in determining when a particular payment scheme constitutes deferred compensation is not whether such payments are made "upon retirement." Rather, the appropriate test is whether such payments are part of a "plan or other arrangement." I.R.C. § 3121(v)(2)(C).

7. The language of I.R.C. §§ 3121(a)(2)(A) and 3306(b)(2)(A) is identical, and the analysis is the same for FICA and FUTA purposes. According-

ly, part 2 of this opinion refers only to I.R.C. § 3121(a)(2)(A).

8. The Social Security Act Amendments of 1983 eliminated sections 3121(a)(2)(A) and 3306(b)(2)(A). However, the 1983 Amendments contained a grandfather clause which provided that the old law still applies to payments made after December 31, 1983, if the payments were attributable to services performed on or before December 31, 1983 (for FICA purposes), on or before December 31, 1984 (for FUTA purposes), and were made pursuant to an agreement in existence on March 24, 1983. Pub.L. No. 98–21, § 324(d)(4), 97 Stat. 126.

The parties have stipulated that the severance payments at issue were at least partially attributable to services performed on or before December 31, 1983 (or December 31, 1984). Defendant does not contest that the severance payments were made pursuant to agreements in effect on March 24, 1983. Plaintiff contends that 1) to the extent these payments are attributable to pre–1984 services, the payments are excluded from the FICA wage base by virtue of former section 3121(a)(2)(A), and 2) payments attributable to pre–1985 services are excluded from the FUTA wage base under former section 3306(b)(2)(A).

Dictionary defines "retirement" as "a withdrawal from office, active service, or business." *Webster's Third New International Dictionary* 1939 (1968). The Oxford English Dictionary defines "retirement" as, among other things, a "[w]ithdrawal from occupation, office or business activity." II *Compact Edition of The Oxford English Dictionary* 2522 (1971).[9] Under the terms of the 1982 CBA and the subsequent Settlement Agreement, an NFL player could receive a severance payment only if he discontinued playing professional football for any NFL team. Thus, plaintiff argues, a football player may receive a severance payment only after he has "withdrawn from his occupation." Plf's Br. filed Feb. 23, 1994, at 18–19. Such payments are thus made "on account of retirement" within the ordinary meaning of that term. *See Perrin v. United States*, 444 U.S. 37, 42, 100 S.Ct. 311, 314, 62 L.Ed.2d 199 (Statutory "words will be interpreted as taking their ordinary, contemporary, common meaning...."), *cert. denied*, 444 U.S. 990, 100 S.Ct. 520, 62 L.Ed.2d 419 (1979); *J.M. Huber Corp. v. United States*, 27 Fed.Cl. 659, 663 (1993).

Defendant advances several arguments that the severance payments were not made "on account of retirement" for purposes of I.R.C. §§ 3121(a)(2)(A) and 3306(b)(2)(A). Defendant first argues that the NFL football players have not retired because they could still work in another capacity, either with their own football team or elsewhere in the NFL. Defendant notes that a player receiving a severance payment is not required to withdraw from his employment by, his service to, or his business relationship with the Buffalo Bills. For example, after completing his football career, the player could continue his employment relationship with the club by working in other categories, such as coaching, scouting, or performing administrative work. Additionally, defendant maintains that the football players have not retired because they could still pursue opportunities outside the professional football industry. Thus, defendant claims, the intention to discontinue a specific type of service, *i.e.*, playing football, is not "retirement" in the sense contemplated by former I.R.C. § 3121(a)(2).

Several problems exist with defendant's argument. First, defendant does not cite a single case or IRS Ruling for the proposition that one "retires" only when the individual has relinquished completely all rights to work in the future. This proposed reading would allow the IRS to maintain that an individual has not "retired" solely because it is possible that an individual could seek employment at a later time. However, an individual who decides to retire would appear to possess the inalienable right to change his mind and "come out of retirement." Before the retiree changes his mind, it stands to reason that the retiree is still retired for purposes of section 3121(a)(2)(A).

Moreover, under the 1982 CBA and Settlement Agreements, the players promised to refund the severance payments if they returned to professional football. By undertaking to repay these payments, the players guaranteed that payments were received only when they permanently retired from professional football. In point of fact, no Buffalo Bills player who received a payment between 1984 and 1986 returned his payment, because no player returned to play professional football. In *New York Post Corp. v. Commissioner*, 40 T.C. 882, 1963 WL 1423 (1963), the court unambiguously stated that severance payments are "in the nature of retirement ... benefits," despite the fact that the employee "did not have to promise not to take another job elsewhere." *Id.* at 889–90, 1963 WL 1423. The court noted "this is not at all unusual; persons retired ... may often seek other employment...." *Id.* at 890, 1963 WL 1423.

Defendant further argues that the NFL football players have not retired because they did not satisfy the requirements for retirement under their own pension plan (the Bert Bell Plan). The 1982 CBA, article XXXIV, entitled "Retirement Plan," provided that the Bert Bell Plan would be continued and maintained in effect during the term of

---

9. Defendant attempts to undercut the authority of the Oxford English Dictionary by noting that it is not "produced domestically." Def's Br. filed

Apr. 13, 1994, at 8. The English language was not produced domestically, in fact.

the Agreement. The Bert Bell Plan defined "Normal Retirement Date" for a former player as the first day of the calendar month coincident with or following the date on which a former player attained 55 years of age. Additionally, the Bert Bell Plan defined "Early Retirement Date" for a former player as the first day of the calendar month coincident with or following the date on which a former player attained 45 years of age. None of the football players to whom the severance payments were made attained either the "normal" or the "early" retirement ages under the Bert Bell Plan. Defendant asserts that a player's failure to qualify under his employer's own retirement plan "militates strongly" against a conclusion that the players have retired for purposes of section 3121(a)(2)(A). Def's Br. filed Apr. 13, 1994, at 11.

The specific age requirements in the Bert Bell Plan do not control the meaning of I.R.C. § 3121(a)(2)(A). The terms of section 3121(a)(2)(A) do not suggest that a taxpayer must reach the age specified in the employer's pension plan in order to treat other payments to employees as made "on account of retirement." Employers routinely provide multiple or supplemental retirement plans that have different eligibility criteria. Indeed, the IRS has treated multiple plans as providing retirement benefits for FICA purposes.[10] Whether an individual meets the criteria in an unrelated retirement plan does not dictate whether a separate payment is made "on account of retirement" within the plain meaning of section 3121(a)(2)(A).[11] Defendant cannot rely on the provisions of the Bert Bell Plan because to do so would impose a supplemental requirement not specified in section 3121(a)(2)(A).

Defendant also argues that the NFL football players have not retired since they are not of "retirement" age: "Although we do not contend that payments to a person who is younger than 65 (or 62) can never qualify as having been made under 'plan' or 'on account of ... retirement,' we do contend ... that the greater the departure from those benchmark ages, the less likely it is that the payments will meet the exception's standard." Def's Br. filed May 31, 1994, at 2. According to defendant, the "turbulent economic milieu" surrounding the Social Security Act and the Social Security Act Amendments of 1939 demonstrate that section 3121(a)(2)(A) was designed to exclude from FICA tax only retirement payments made to elderly persons. Def's Br. filed Apr. 13, 1994, at 16. By contrast, the severance payments at issue here cannot have been made on "account of retirement" because they were made to football players who were relatively young and, as defendant curiously observes, "unusually robust." *Id.*

Congress did not discuss an age requirement in the context of I.R.C. § 3121(a)(2)(A). However, Congress did establish specific minimum retirement age requirements in other parts of the 1939 Social Security Act Amendments. *See, e.g.,* Social Security Act Amendments of 1939, Pub.L. No. 76–379, §§ 102, 202, 53 Stat. 1360 (1939). Indeed, defendant's reliance on the legislative history is unpersuasive precisely because defendant is unable to demonstrate congressional intent to include an age requirement in section 3121(a)(2)(A).[12] Even if, as defendant claims, age is highly relevant in determining when a person retires, then it would seem that the type of occupation the person retires from is

**10.** *See, e.g.,* Rev.Rul. 79–328, 1979–2 C.B. 351; Priv.Ltr.Rul. 89–10–016 (Dec. 7, 1988); Priv. Ltr.Rul. 82–46–107 (Aug. 20, 1982).

**11.** A minimum retirement age was an explicit requirement under separate provisions in the 1939 Amendments, *see, e.g.,* Pub.L. No. 76–379, §§ 102, 202, 53 Stat. 1360. However, Congress did not specify a minimum retirement age for purposes of I.R.C. §§ 3121(a)(2)(A) and 3306(b)(2)(A). Congress subsequently added provisions to the Code expressly excluding from "wages" amounts paid to an employee upon reaching the specified retirement age in an employer's retirement or pension plan. *See* former

I.R.C. §§ 3121(a)(13) and 3306(b)(10). Plaintiff notes that, if sections 3121(a)(2)(A) and 3306(b)(2)(A) required individuals to reach a specific retirement age, then the addition of these new provisions in 1967 would have been unnecessary.

**12.** The absence of an age requirement in section 3121(a)(2)(A) is not unique. Military and other governmental personnel receive pensions that are exempt from FICA tax, regardless of the recipient's age upon retirement. *See, e.g.,* I.R.C. § 3121(a)(5)(E).

equally relevant. Following this approach, the age of a retiree should be considered in conjunction with the retiree's occupation. Professional athletes typically retire in their early thirties because they no longer possess the physical strength, stamina, and durability necessary to out-perform the younger, more physically capable athletes competing for their jobs. In this sense professional athletes retire for the same reasons that "elderly" persons retire. For football players the retirement age is particularly early because of the intensely physical nature of their sport.

Finally, defendant argues that the severance payments should not be viewed as made on account of retirement because they are, in effect, similar to dismissal wages and are therefore taxable for FICA and FUTA purposes. Taking a cue from plaintiff, defendant cites Webster's, which defines "dismissal wage" (not "payments") as "a sum paid in addition to salary or wages to an employee discharged through no fault of his own: SEVERANCE PAY." *Webster's Third New International Dictionary* 652 (1976). Thus, according to defendant, "severance pay" is synonymous with "dismissal wages." "Dismissal wages" are not made "on account of retirement" and consequently cannot escape FICA tax.

Plaintiff's severance payments are not the equivalent of "dismissal wages" because they were not made to players who were dismissed. Rather, the payments were made to players who ceased playing professional football. The players were not "discharged through no fault of ... [their] own." Def's Br. filed Apr. 13, 1994, at 16–17 (quoting *Webster's Third New International Dictionary* 652). By contrast, article XXXV of the 1982 CBA required NFL clubs to make "termination pay" to players whom the clubs discharged.

The plain meaning of I.R.C. § 3121(a)(2)(A) does not allow the various supplemental requirements urged by defendant. Section 3121(a)(2)(A) requires only the recipient's "retirement." This straightforward exclusion is not contingent upon retirees refusing future employment, obtaining eligibility under their employer's pension plan, or reaching a specific age. *Id.; see Madison Galleries,* 870 F.2d at 629–30; *J.M. Huber Corp.,* 27 Fed.Cl. at 663. Moreover, any doubt as to the meaning of "retirement" for purposes of I.R.C. § 3121(a)(2)(A) must be resolved in favor of taxpayer Buffalo Bills. *Ocean Drilling,* 24 Cl.Ct. at 734 (citations omitted). Plaintiff's severance payments to NFL football players who ceased playing professional football for their own and every other team were made "on account of retirement." The severance payments fall squarely within I.R.C. § 3121(a)(2)(A) and are not subject to FICA tax.

## CONCLUSION

Accordingly, based on the foregoing, plaintiff's motion for summary judgment on the issue of liability is granted, and defendant's cross-motion for summary judgment is denied. The parties shall file a Joint Status Report by December 5, 1994, stating the amount of judgment to be entered in plaintiff's favor.

**IT IS SO ORDERED.**

Plaintiff shall have its costs.